**H. Lynn BRANCH, Administrator of the Estate of Dwayne Elijah Bell, Plaintiff,**

v.

**G. BERND COMPANY, et al., Defendants.**

Civ. A. No. 89–242–2–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

May 30, 1991.

John A. Draughon, Sell & Melton, Macon, Ga., for plaintiff.

W. Melvin Haas, Jeffery L. Thompson, Haynsworth, Baldwin, Johnson & Harper, Macon, Ga., for G. Bernd Co.

Craig N. Cowart, Jones, Cork & Miller, Macon, Ga., for Pan American Life Ins. Co.

Michael R. Hurst, Heyman & Sizemore, Atlanta, Ga., for Blue Cross & Blue Shield of Ga., Inc.

OWENS, Chief Judge:

The present action was filed on July 13, 1989, under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and the Consolidated Omnibus Budget Reconcil-

iation Act of 1985, 29 U.S.C. § 1161, *et seq.*, as amended ("COBRA"), by H. Lynn Branch ("Branch") in his capacity as administrator of the estate of Dwayne Elijah Bell. On March 25, 1989, Mr. Bell suffered severe injuries when he was shot several times. He was admitted to the Medical Center of Central Georgia, in Macon, where he remained until his death on April 16, 1989. The present litigation concerns the disputes with regard to who should be held responsible for payment of the approximately $98,000.00 in medical bills incurred during Mr. Bell's treatment.

On October 10, 1990, a non-jury trial was held in this matter. This court, by its letter of March 28, 1991, afforded the parties an additional opportunity to address any remaining issues relevant to the court's final resolution of this matter. The court received no responses from the parties by the date set out in the court's letter.[1] The court, by subsequent letter (April 12, 1991) afforded the parties a final opportunity to address the issue of upon whom liability falls should the court rule in favor of Branch. The court, after careful consideration of the evidence presented at the trial, all arguments and memoranda of counsel for all parties, and the record as a whole, hereby makes the following findings of fact and conclusions of law.

### FACTS

Mr. Bell was employed by defendant G. Bernd Company ("G. Bernd") from September 19, 1988, until March 15, 1989. On March 15, 1989, Mr. Bell voluntarily terminated his employment with G. Bernd. Mr.

Bell first attempted to resign from the company over the telephone by calling Ms. Jane Pratt ("Pratt"), an administrative assistant at G. Bernd. The record indicates that during the course of the phone conversation Pratt attempted unsuccessfully to advise Mr. Bell with regard to his right to continuation coverage under COBRA.

As a G. Bernd employee, Mr. Bell was covered under G. Bernd's Employee Welfare Benefit Plan ("the Plan"). Defendant's Exhibit 8. The health and hospitalization portion of the Plan was, until termination of coverage effective midnight March 26, 1989, provided under a policy of insurance issued by defendant Pan American Life Insurance Company ("PALIC"). Effective March 27, 1989, coverage was provided by Blue Cross and Blue Shield ("BCBS").[2] G. Bernd acted as "plan administrator" for this coverage under both policies.

■ ERISA, 29 U.S.C. § 1022 requires the preparation of a summary plan description to be furnished to all participants and beneficiaries. ERISA further requires that:

> [T]he summary plan description shall … be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.

*Id.; see also* 29 C.F.R. § 2520.102–2(a) (1989) (summary shall be sufficiently comprehensive to fully inform plan participants and beneficiaries).[3]

---

1. Counsel for Branch did respond to the court and stated that he had no objection to an additional hearing should any of the other parties request it. However, he did not indicate a desire for such a hearing to be held.

2. The court notes the disputes among the defendants with regard to which policy, in the event the court determines that Mr. Bell was entitled to continued coverage from the time of his shooting through the time of his death, was properly in effect at that time. These issues are addressed *infra.*

3. Counsel for PALIC argues that because § 1022 does not specifically list notification with regard to COBRA rights as information which must be

included in an summary plan description, COBRA information need not be listed in the SPD. *See* Counsel for PALIC's Letter (March 15, 1991). The court initially notes that COBRA itself requires written disclosure of COBRA rights to every plan beneficiary at the time of commencement of coverage. 29 U.S.C. § 1166(a)(1). The record indicates that the only attempt made by G. Bernd to comply with this directive was through the distribution of the SPD. In addition, COBRA information, because it concerns "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits," falls under ERISA's general reference to materials which must be included in a summary plan description. 29 U.S.C. § 1022(b).

While the parties have proceeded in the case *sub judice* upon the assumption that the relevant election period is sixty (60) days, the G. Bernd employee summary benefit plan description ("the SPD") distributed to G. Bernd employees like Mr. Bell, Defendant's Exhibit 9, sets out no specific election period. Nor is there any evidence in the record to the effect that Mr. Bell ever received either written or oral notice that election of continuation coverage was subject to a sixty (60) day election period. The SPD was drafted from PALIC's "Group Master Plan," which was the Plan in effect at G. Bernd. The Group Master Plan includes a provision entitled "Election Period" which plainly states:

> There is a sixty (60) day election period. It begins on the date coverage terminates or from the date the notice is received by the affected insured. To continue, the affected insured must submit a written application and pay the required premium within the Election Period.

Defendant's Exhibit 8, p. 43. The portion of the Group Master Plan which sets out the sixty (60) day election period simply does not appear in the SPD. Apparently, through oversight, PALIC failed to insert the page setting out the election period in the SPD.[4]

Pratt testified that when Mr. Bell called announcing his intention to quit she attempted to advise him of his COBRA rights, that as a G. Bernd employee he could enjoy continued insurance coverage and benefits, even after termination of employment, by electing continuation coverage under the Plan.[5] Apparently, Mr. Bell, leaving G. Bernd on less than friendly terms, did not respond to Pratt's representations with regard to continued coverage; Mr. Bell simply used this phone conversation as an opportunity to unleash his frustrations, in the form of assorted vulgarities and expletives, at a G. Bernd representative. He stated that he wanted nothing more to do with G. Bernd and hung up the phone.

Later that day, Mr. Bell came to G. Bernd's offices. Pratt was again the unfortunate recipient of Mr. Bell's vulgar editorial commentary about G. Bernd. Pratt presented Mr. Bell with a COBRA election form which he bluntly refused to fill out or sign. He demanded his paycheck. When Pratt informed him that his paycheck would not be ready until the following day, Mr. Bell left the office.

The following day, Mr. Bell returned to pick up his check. Pratt had attached a COBRA election form to the check along with instructions to whomever provided Mr. Bell with his check to get him to make an election on the attached form. Apparently, Mr. Bell returned for his check while Pratt was at lunch; it is unclear from the record who gave Mr. Bell his check. A COBRA election form with Mr. Bell's name on it was presented at trial. Defendant's Exhibit 4.[6] Mr. Bell did not fill out the

Finally, because the SPD in the case *sub judice* addressed COBRA rights, the tendency of this information, even if voluntarily supplied, to mislead or fail to inform plan beneficiaries is relevant to these proceedings.

4. The court, having found what appeared only to be a gap in the court's copy rather than the actual SPD, contacted counsel for Palic to request the "missing" page. Counsel for Palic stated that the page was apparently not in the original of the Benefit Plan—that page was simply not included in the document. *See* Court Memo to File: March 4, 1991.

5. Despite Pratt's general testimony that she spoke to Mr. Bell and other employees about their COBRA rights, she never specifically referred to any event which made Mr. Bell aware of a sixty day election period. In fact, the only specific reference to a time period which Pratt made while talking to Mr. Bell was the follow-ing confusing attempt to explain his election rights:

> I explained to him [Mr. Bell] ... about COBRA and his right to elect to continue coverage under the group health rates, that he could continue it for eighteen months.

*See* Transcript of Non–Jury Trial: Tab 51, p. 25.

6. The election form used by G. Bernd was apparently a photocopy of one side of the top sheet of what was originally a two-sided triplicate form drafted by one of G. Bernd's previous insurance carriers, Ohio State Life. *See* Deposition of Pratt: Tab 33, p. 12. Close inspection of this exhibit reveals that the original from which it is copied specifically set forth a sixty (60) day election period on side two of the form. The photocopy used as an original by G. Bernd makes no reference to an election period; the entire second side of the text is omitted from the form used by G. Bernd.

portion of the form pertaining to acceptance or declination of continued coverage. Rather than electing whether to continue his coverage, Mr. Bell filled out that portion of the election form pertaining to health coverage for dependents—Mr. Bell had neither dependents nor dependent coverage. No witness was presented to attest to Mr. Bell's signature on the form or to the fact that it was indeed Mr. Bell who filled out the form.[7] The court is nonetheless satisfied that this form was indeed executed by Mr. Bell when he picked up his last check.[8]

On March 25, 1989, Mr. Bell was shot several times by an unidentified gunman. Mr. Bell was admitted to the Medical Center of Central Georgia in Macon ("the Med Center"). He was treated in the emergency room and later transferred to the intensive care unit where he remained comatose or semi-conscious until he died from the gunshot wounds on April 9, 1989. The hospital bill for Mr. Bell's care and treatment was $98,692.00.

On March 30 or 31, 1989, Ms. Mabel Pinkston ("Pinkston"), the assistant director of admissions at the Med Center, called Pratt to inquire with regard to whether Mr. Bell had insurance or was eligible for COBRA benefits. Pratt, at that time unaware of the form executed by Mr. Bell on March 16, 1989, prepared an additional election form and sent it to the Med Center. Pratt apparently told Pinkston that Mr. Bell was still eligible for COBRA benefits. Plaintiff's Exhibit # 1; Transcript of Non–Jury Trial p. 47.

It is undisputed that Mr. Bell was never able to execute an election form during his hospital stay. The Med Center staff attempted without success to have Mr. Bell execute either the COBRA election form or a power of attorney. Branch next attempted to schedule meetings with a Ms. Faulk, Mr. Bell's mother, to allow her to take over Mr. Bell's affairs. These efforts were fruitless and no other family member stepped forward to attend to Mr. Bell.

Finally, on May 25, 1989, over one month after Mr. Bell passed away, Branch was appointed temporary administrator by Bibb County Probate Judge William J. Self. Plaintiff's Exhibit 2. Branch immediately executed the COBRA election form on behalf of the estate of Mr. Bell, electing to continue coverage and delivered the form to G. Bernd on May 25, 1989. Plaintiff's Exhibit 3. At the same time, Branch tendered a cashier's check ($428.16) to G. Bernd to cover Mr. Bell's March and April insurance premiums. Plaintiff's Exhibit 4.

On May 25, 1989, Pratt spoke with Ms. Mary Katz ("Katz"), attorney for Branch in his capacity as an agent of the Med Center. Pratt advised Katz that only that day Pratt had discovered that Mr. Bell had executed an election form on March 16, 1989. Pratt stated that Mr. Bell had effectively elected not to continue coverage, thereby preempting Branch's election form executed on May 25, 1989.

BCBS and G. Bernd executed the agreement for the BCBS insurance plan on May 12, 1989. Coverage was made effective retroactively to March 27, 1989. BCBS was not made aware of G. Bernd's potential health insurance liability with regard to Mr. Bell until some time after the contract for coverage was executed.

7. The circumstances surrounding Mr. Bell's alleged execution of the COBRA election form are somewhat suspicious. No witness could testify that they provided Mr. Bell with the form or witnessed his signature. In addition, at the trial Pratt testified that she was not aware of the allegedly executed form until sometime later, May 25, 1989. Office policy was for forms such as this COBRA form to be kept in the employee's insurance file. The election form here was discovered later among the papers in Mr. Bell's personnel file, a file maintained separately from the insurance files.

8. Branch does not vehemently dispute the authenticity of the form. Furthermore, the court is not troubled a great deal by the fact that no G. Bernd employee testified that they witnessed Mr. Bell pick up his check and execute the election form. Surely, an employee's decision to quit his job and his subsequent office visit to pick up his last pay check were something less than pivotal events in the day-to-day operations at G. Bernd. What appears to have happened in the present case is a disgruntled former employee unceremoniously, hurriedly and angrily filled out the paperwork, took his pay check, and left the office.

## DISCUSSION

COBRA was signed into law on April 7, 1986, as an amendment to ERISA, mandating that employer-provided health plans furnish employees and their dependents an option for continuing coverage in certain enumerated circumstances where coverage had traditionally been unavailable, *i.e.*, termination of employment, work hour reductions, death, etc. *See National Companies Health P. v. St. Joseph's Hospital*, 929 F.2d 1558, 1567 (11th Cir.1991); Somers, T. "COBRA: An Incremental Approach to National Health Insurance." 5 *Journal of Contemporary Health Law and Policy* 141 (1989). COBRA, 29 U.S.C. § 1161(a) provides:

> The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

A simple notion: employees and their dependents/spouses, upon the occurrence of a "qualifying event," which COBRA defines *inter alia* to be an event such as Mr. Bell's termination of his employment, 29 U.S.C. § 1163(2) (termination for reasons other than employee's gross misconduct), may, during a defined period, opt to continue, at their own expense, coverage under the employer's health care plan. Unfortunately, simple notions often become complex disputes when put into practice.

The central disputed issue in the present case is, like the policy underlying COBRA, at first blush deceptively simple:

> [W]hether the election form executed by Branch in his capacity as temporary ad-

ministrator of Mr. Bell's estate effectively activated Mr. Bell's health benefits under COBRA.

To resolve this issue the court must address arguments of counsel challenging the propriety of most every factual occurrence in this case, from Mr. Bell's alleged execution of the election form on March 16, 1989, to G. Bernd's failure to inform BCBS of their potential liability for the insurance claims arising from Mr. Bell's unfortunate death. Perhaps most troublesome to the court is the absence of specific legislation, the lack of clear regulations, and a paucity of judicial precedent for the implementation of COBRA.[9] The court addresses the legal disputes in the case *sub judice* chronologically.

### A. The Election Form

■ G. Bernd, PALIC, and BCBS (collectively "defendants") assert that the present case is easily resolved under COBRA. Defendant's argue that the form executed by Mr. Bell on March 16, 1989, while negligently executed, nonetheless was an election to discontinue health care coverage. Counsel for PALIC concludes that to interpret the form any other way is to "ignore reality."

Despite this identified danger, the court finds unpersuasive defendants' arguments as to the effect of the election form. In reality, the form executed by Mr. Bell amounts to no more than an extension of his earlier orally expressed desire to distance himself from G. Bernd. He was apparently under the impression that he could not get his check until he signed some paperwork—the election form.[10] The lack of available instruction from Pratt, who was away from her desk for lunch, or from

---

9. While COBRA directs the Secretaries of Labor and the Treasury to promulgate regulations for COBRA procedures, only the Treasury Department has compiled proposed regulations—regulations which are instructive, but fall short of the level of specificity needed to clarify COBRA's general provisions.

10. Of course, withholding money or other benefits already owed to an employee in order to compel the employee to make an election is improper under COBRA and, according to the regulations would amount to a violation by the

provider. A waiver of continued coverage procured in such a manner is invalid. *See* 52 Federal Register 114, Q & A–36, p. 22,729 ("An employer must not withhold anything to which a qualified beneficiary is otherwise entitled … in order to compel payment for COBRA continuation coverage or to coerce the qualified beneficiary to give up rights to COBRA continuation coverage (including the right to use the full election period to decide whether to elect such coverage)").

the form itself on how to fill out the form combined with Mr. Bell's disposition produced a document essentially useless to the court's analysis. No witness has testified with regard to whether Mr. Bell expressed any intentions at the time he executed the form, nor does Mr. Bell's prior raving against G. Bernd amount to a clear expression of his preference with regard to COBRA benefits. To find that this incomplete election form amounts to an informed election under COBRA would be inconsistent with the policies underlying COBRA and ERISA generally. *See e.g.,* 29 C.F.R. §§ 2520.102–2520.104 (ERISA provisions emphasizing the importance of fully informing employees of the benefits available under an employer's benefit plan).

■ The form executed by Mr. Bell on March 16, 1989 merely approximates the date on which Mr. Bell was notified of his rights under COBRA, thereby marking the beginning of an election period of at least sixty (60) days. 29 U.S.C. § 1165(1)(B & C).[11] Just nine or ten days after the election period began, Mr. Bell was gunned down. From that day until April 9, 1989, the date of his death, Mr. Bell was incapacitated and incapable of executing an election form.

## B. Determination of Rights Absent Election By the Beneficiary

Under COBRA, a health plan beneficiary may use the full election period to decide whether to elect coverage—*See* 52 Fed. Reg. 114, p. 22,729, Q & A–36—coverage which applies retroactively to the date of the "qualifying event." *See Id.* Q & A–34 ("If the election is made during [the election] period, coverage must be provided from the date that coverage would otherwise have been lost"). This "negative selection" period has been criticized as allowing a beneficiary to take a "wait and see" approach, waiting out the election period to determine if a compensable incident of greater cost than the insurance premium occurs during the election period: if so, electing to continue coverage for the relatively low price of an insurance premium. *See Somers, supra,* at 152. If no such event occurs, the beneficiary may elect not to continue coverage.

The mere fact that Mr. Bell suffered an otherwise covered injury during the election period does not, however, automatically guarantee him, or his estate, COBRA benefits and end the court's analysis. *See* 52 Fed.Reg. 114 at 22,729, Q & A 34 ("Of course, claims incurred by a qualified beneficiary during the election period does (sic) not have to be paid *before* the election (and, if applicable, payment for the coverage) is made") (emphasis added). The court notes that while the language of the regulation clearly calls for an election to be made for benefits to be available, the language chosen by the Treasury Department, and, for that matter, common sense, presuppose that under such circumstances a beneficiary will elect in favor of continuation coverage. In the case *sub judice,* it does not require a tremendous leap of faith to conclude that Mr. Bell, after being shot, if himself able, would have unceremoniously

---

11. During Mr. Bell's initial telephone call to G. Bernd, Pratt allegedly informed him of his COBRA rights. Counsel for PALIC argues that, March 15, 1989, the date of the phone call, should, therefore, mark the beginning of the election period. Whether the date of notification was March 15 or 16, 1989, is of little consequence to the disposition of this case. A more interesting analysis would concern whether G. Bernd's arguable failure to notify Mr. Bell of his rights in writing forecloses arguments that the election period ever began to run. *See Somers, supra,* at 150 (plan administrator must notify beneficiary of COBRA rights *in writing* within fourteen days of receiving notice of qualifying event) (emphasis added). COBRA and the regulations do not specifically call for this notice to

be given in writing, and courts have generally validated methods of notice which are calculated to reach the beneficiary. *See Dehner v. Kansas City Southern Industries, Inc.,* 713 F.Supp. 1397, 1400–01 (D.Kan.1989) (notice somewhere between first class mail and mere posting sufficient so long as method evidences good faith attempt to comply with notice requirements). G. Bernd attempted on two occasions to discuss Mr. Bell's COBRA rights with him. While the substance of the notice which would have been provided is unclear, Mr. Bell's animosity accounted in part for the incomplete nature of Pratt's explanation of COBRA rights after the qualifying event. The court, therefore, declines to determine whether written notice is required under COBRA.

executed an election form favoring continuation coverage.

Unfortunately, Mr. Bell was unable to make such an election on his own. Branch's efforts to have a member of Mr. Bell's family come forward and act on his behalf were fruitless. Exhausting all other possibilities, Branch sought and was granted appointment as temporary administrator of Mr. Bell's estate in order that Branch might finalize the necessary affairs.

■ Counsel for PALIC argues that Branch, as administrator of Mr. Bell's estate, was not empowered to execute the election form. Counsel relies upon a strict, literal reading of COBRA language which provides that an election can be made by a covered employee, a spouse, or a dependent child. 29 U.S.C. § 1167. This argument is without merit and ignores both the nature of the role of the administrator, defined as carrying on the affairs of the deceased on his behalf, as well as the language of the applicable regulations. *See* 52 Fed.Reg. at 22,730, Q & A–37 ("An election on behalf of a qualified beneficiary who is incapacitated or dies can be made by the legal representative of the qualified beneficiary or the qualified beneficiary's estate ...").

## C. The Election Period

BCBS and G. Bernd argue that Branch's otherwise permissible execution of the election form provided to the hospital by G. Bernd was untimely and, therefore, invalid.[12] It is undisputed that Branch executed the form on May 25, 1989, more than sixty (60) days after March 16, 1989, the date when Mr. Bell was appraised of his rights under COBRA. The court addresses, *infra*, arguments with regard to whether, under the circumstances in the case *sub judice*, the election period was tolled from either the date of Mr. Bell's incapacity (March 25, 1989) or his death (April 9, 1989) until the date of Branch's appointment and

execution of the election form as temporary administrator of Mr. Bell's estate. However, before addressing such arguments, the court must first determine the length of the relevant election period in the case *sub judice*. Should the court determine that Branch's execution of the form occurred during the election period—despite the undisputed passing of more than sixty (60) days—arguments with regard to tolling may be irrelevant.

*1) "... at least sixty days ..."*

■ The court, again, notes the pronounced absence of any evidence which would indicate that Mr. Bell was ever specifically informed, either orally or in writing, that he enjoyed only a sixty (60) days election period. Counsel for G. Bernd responds that COBRA's provision for an election period "of at least 60 days' duration," 29 U.S.C. § 1165(1)(B), while phrased as a minimum requirement, does not point to a provider's plan documents as a source for extending the period beyond 60 days.

In support of this argument, counsel for G. Bernd contrasts COBRA's provisions setting out the "election period" with those concerning the "grace period" (the period during which a covered employee may pay the premium for the continuation of coverage). Counsel points out that COBRA and the proposed regulations contemplate the ability of a provider, through the individual benefit plan terms, to expand the grace period for premium payment. *See* Counsel for G. Bernd's Letter to the Court (March 15, 1991) (citing 52 Fed.Reg. 22731–22732).

Counsel for G. Bernd has, indeed, uncovered an underlying policy, as evidenced in the proposed regulations, favoring flexibility with regard to the duration of the "grace period." What counsel for G. Bernd fails to take into account are the proposed regulations reflecting similar policy with regard to the "election period."

---

**12.** Defendants also argue that Branch's execution of the election form, if valid and timely, amounted only to a revocation of Mr. Bell's prior waiver of continuation coverage. The court, having determined that the March 16, 1989, election form had the effect only of putting Mr. Bell on notice of his option to elect continuation coverage, need not address arguments that the form executed by Branch had no retroactive effect. *Cf.* 52 Fed.Reg. 114, p. 22,-729, Q & A–35 ("if a qualified beneficiary who waives COBRA continuation coverage later revokes the waiver, coverage need not be provided retroactively").

Specifically, at Q & A–32, the regulations address the following question:

> What is the *minimum* period during which a group health plan must allow a qualified beneficiary to elect COBRA continuation coverage (i.e., the election period)?

52 Fed.Reg. 22728–22729 (emphasis added). Consistent with COBRA's overall policy favoring flexibility and fairness in the provision of employee/beneficiary benefits, the proposed regulation continues:

> The election period *must not end before* the date that is 60 days after the later of (a) the date that the qualified beneficiary would lose coverage on account of the qualifying event, or (b) the date that the qualified beneficiary is sent notice of his or her right to elect.

*Id.* (emphasis added).

BCBS nonetheless argues that COBRA states Congress' rigid policy that the election period extends only for sixty (60) days; BCBS concludes, "[t]he congressional intent could not be more specific." *See* Trial Brief of BCBS, p. 9. The court sees room for much greater specificity in both the proposed regulations and COBRA itself. COBRA's language is, in actuality, quite malleable in its definition of the proper election period. COBRA defines the "election period" as follows:

#### (1) Election Period

The term "election period" means the period which

(A) begins not later than the date on which coverage terminates under the plan by reason of the qualifying event,

(B) is of *at least sixty days duration,* and

(C) ends *not earlier than 60 days after the later of*—

(i) the date described in subparagraph (A), or

(ii) [the date on which the qualified beneficiary is notified of his COBRA rights].

29 U.S.C. § 1165(1) (emphasis added).

Contrary to the arguments of BCBS, it appears that Congress legislated not a maximum length for the election period's duration but a statutory minimum. This reading is consistent with the policies underlying the passage of COBRA. *See* House Report No. 99–241, Part 1 p. 44 *reported in* 1986 U.S.Code Congressional and Administrative News, vol. 3, 579, 622 ("House Report"). The House Report reads as follows:

> The Committee is concerned with reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our nations hospitals to provide care to those who cannot afford to pay.... In an effort to provide continued access to affordable private health insurance for some of these individuals, the Committee has proposed the following legislation....

*Id.* Like COBRA and the relevant proposed regulations, the House Report does not refer to an absolute maximum election period but instead states that the "option of electing continuation coverage ... lasts *at least 60 days*". *Id.* (emphasis added).

That the sixty (60) day election period reflects a minimum rather than a set duration is clear from the choice of words made by Congress and, with regard to the proposed regulations, the Department of the Treasury. COBRA does not precisely define a statutorily set duration for the election period; employers are free to formulate election periods of greater duration. COBRA, the proposed regulations, and the House report simply set a floor below which the election period may not fall. So long as the employer does not limit the election period to less than sixty (60) days, the period's duration, up to a maximum equal to the eighteen month period during which coverage may be provided, is a matter for the employer/insurer's determination.

In the face of clear language from Congress, defendants steadfastly argue that the policy underlying COBRA calls for the sixty (60) days election period to be an absolute bar to continuation coverage. *See Somers, supra,* at 152 ("A failure to make an election within the confines of the sixty day election period ... is an absolute bar to

any COBRA entitlement") (citing 52 Fed. Reg. 144 at 22,728 (Q & A 32)); *see, also, National Companies*, 929 F.2d at 1563 ("ERISA gives individuals sixty days from the date coverage under their ERISA plan ends to choose or waive continuation coverage"). A close examination of the commentaries and case law which have offhandedly referred to a flat sixty day election period demonstrates that the precise issue of whether the sixty (60) day period applies automatically has not been directly addressed.

The very regulation which the *Somers* article cites in support of his conclusion that the sixty (60) day period is an absolute bar, actually addresses the question of the "minimum period during which a group health plan must allow a qualified beneficiary to elect." 52 Fed.Reg. 144 at 22,728. This language suggests no preset absolute bar to COBRA rights. Rather, it impresses upon the employer/insurer the responsibility of affirmatively setting, subject to a proscribed minimum, the election period.

Case law referring in passing to the sixty (60) day election period merely demonstrates a recognition that insurers generally prefer to limit the period during which they will offer continuation coverage to beneficiaries. Such cases do not represent a judicial determination that the election period is set at sixty (60) days. In *National Companies* itself, the Eleventh Circuit specifically states:

> Once it is determined that continuation coverage is available to a particular individual and that a qualifying event has occurred, the qualified beneficiary has, *at a minimum*, sixty days to choose such coverage under his previous plan ... The maximum length of time a plan must provide continuation coverage to

employees ... is eighteen months from the date of the qualifying event.

*National Companies*, 929 F.2d at 1567–68 (emphasis added). The sixty (60) day period referenced in COBRA, the proposed regulations, case law, and commentaries is a minimum period during which continuation coverage must be offered for election.

Consistent with the policies underlying COBRA and ERISA generally, an employer/insurer's failure to include the statutory minimum period in the summary plan description exposes the employer/insurer to the same dangers faced by employers/insurers with plans that misinform or fail to inform employees of the rights under the plan—including their COBRA rights.

■ PALIC argues, in an alternative vein, that even if the SPD left unclear or open the duration of the election period, Branch should not be allowed to recover based upon arguments that PALIC's failure to specifically set out the sixty (60) day election period in the SPD worked to Mr. Bell's detriment. PALIC acknowledges the existence of cases which have protected employees who justifiably relied upon misrepresentations in summary benefit plans. PALIC argues, however, that such cases are inapposite in that Mr. Bell did not rely upon any representations with regard to an extended election period; Branch cannot then recover based upon an estoppel theory.[13] While PALIC's arguments appear to be compelling on their face, the court finds that such a result would be inconsistent with case law construing summary benefit plans and the policies underlying ERISA and COBRA.

In *McKnight v. Southern Life and Health Ins. Co.*, 758 F.2d 1566 (11th Cir. 1985), the defendant insurance company argued that when a conflict arises between

---

**13.** Counsel for PALIC attempts to convince the court that PALIC's failure to set out an specific election period of sixty (60) days and instead setting out a thirty one (31) day period during which employees were to make an election should actually be read in defendants' favor. PALIC argues that Mr. Bell should have been all the more concerned with regard to potential time limitations. *See* Counsel for PALIC's letter to the court: March 15, 1991. The court cannot

accept arguments that setting the election period in a summary plan description at a level specifically prohibited by COBRA—thereby misinforming a beneficiary as to his COBRA rights—should inspire the court to reach the harsh result of denying plaintiff benefits for failure to elect within a sixty (60) day period found only in the Plan: a plan which was never distributed to the employees.

the insurance plan and the summary plan description, the terms of the insurance plan should prevail. The Eleventh Circuit disagreed and posited:

> Such an assertion defeats the purpose of the summary. It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet.

*Id.* at 1570; *See also Heidgerd v. Olin Corp.,* 906 F.2d 903, 908 (2nd Cir.1990) ("where the terms of a plan and those of a plan summary conflict, it is the plan summary that controls").

■ Resolution of conflicting provisions in a plan and the summary plan description in favor of those contained in the summary is consistent with the purposes of ERISA. Most notably, such a result protects plan beneficiaries by ensuring that they are fully and accurately apprised of their rights under the plan. *See Matter of Heci Exploration Co., Inc.,* 862 F.2d 513, 524 (5th Cir.1988). ERISA requires the preparation and distribution of the clearly-drafted summary plan description describing, *inter alia,* "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." *See* n. 3, *supra.* In most instances, like the case *sub judice,* the summary plan description (here the SPD) is the only explanation of the plan distributed to employees. ERISA contemplates that the summary plan description will be an employee's primary source of information regarding employment benefits; employees are entitled to rely on the descriptions contained in the summary.[14] *See Heidgerd,* 906 F.2d at 907–08 ("To allow the Plan to contain different terms that supersede the terms of the [summary plan description] would defeat the purpose of providing employees with summaries"). Enforcement of the terms of the summary plan description also encourages employers/insurers to draft such summaries taking care to ensure that the terms of the summary accurately reflect the benefits in the plan.

■ PALIC argues that built into these cases is a requirement that the employee demonstrate some actual reliance upon the terms of the summary. The court recognizes the requirements for a plaintiff to invoke the federal common law doctrine of equitable estoppel, *see National Companies,* 929 F.2d at 1572.[15] However, the present case does not involve traditional notions of estoppel; the case before the court concerns whether G. Bernd's/PALIC's arguable failure to fully comply with the statutory requirements of ERISA with regard to the preparation and distribution of a summary plan description forecloses defendants from relying upon the terms of the plan to deny benefits.

■ The doctrine of estoppel directs that a party's own acts stops or closes his/her mouth to allege or plead the truth. *See* Black's Law Dictionary, p. 648 (4th ed. 1968). In fact, under the prevailing law governing ERISA, the terms of the summary plan description become "the truth." Poor drafting of a summary plan description may extend or enlarge coverage which would otherwise be unavailable. *See Heidgerd,* 906 F.2d at 909 (benefits available under reasonable reading of summary in situation where benefits unavailable under plan). Such a result is unavailable by application of the doctrine of equitable estoppel. *See Kane v. Aetna,* 893 F.2d 1283, 1283, n. 3 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) ("estoppel may not be invoked to enlarge or extend the coverage specified in the con-

---

**14.** These policies are equally applicable to situations where a summary plan description fails to inform the employee with regard circumstances which might lead to a loss of benefits.

**15.** The elements of equitable estoppel, as defined by federal common law, are: (1) misrepresentation of material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended or had reason to believe the party asserting estoppel would rely upon the misrepresentation; (4) the party asserting estoppel did not know, nor should it have known, the true facts; (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation. *Id.*

tract") (citing 18 M. Rhodes, *Couch Cyclopedia of Insurance Law* § 71:40 (Rev. ed. 1983) ("The doctrine of estoppel cannot be given the effect of enlarging or extending the coverage as defined in the contract); *But see* W. Meyer, *Life & Health Insurance Law* § 9:16 ("waiver or estoppel may operate to avoid a forfeiture of a policy").

Case law enforcing the terms of a summary plan description despite contrary terms in the plan itself is arguably distinct —and, therefore, subject to different requirements—from cases applying the doctrine of equitable estoppel. In fact, case law in this area specifically suggests that, unlike a party invoking the doctrine of equitable estoppel, a plaintiff who seeks to enforce the terms of a summary plan description need not prove detrimental reliance in order to recover. *Edwards v. State Farm Mut. Auto Ins. Co.*, 851 F.2d 134, 137 (6th Cir.1988); *But see Govoni v. Bricklayers, Masons & Plasterers*, 732 F.2d 250, 252 (1st Cir.1984) ("Case law suggests that to secure relief, [plaintiff] must show some significant reliance upon, *or possible prejudice flowing from*, the faulty plan description") (emphasis added).[16]

The court is in agreement with the Sixth Circuit's reasoning in the *Edwards* case. The *Edwards* court stated:

[E]xisting precedent does not dictate that a claimant who has been misled by summary descriptions must prove detrimental reliance. Congress has promulgated clear directives prohibiting misleading summary plan descriptions. The court elects not to undermine the legislative command by imposing technical requirements on the employee.

*Edwards,* 851 F.2d at 137; *but see Gridley,* 924 F.2d at 1319 (detrimental reliance required). ERISA requires employers to produce accurate plan summaries; for courts to read into ERISA a requirement that employees demonstrate detrimental reliance frustrates congressional objectives. Consistent with ERISA's allocation of responsibilities, in *Hamilton v. Air Jamaica, Ltd.,* 750 F.Supp. 1259 (E.D.Pa.1990), the district court, rather than addressing an employees right to rely on the terms of the summary, held that *Edwards* precluded *the employer* from relying on contrary plan documents to dislodge the terms set out in the summary. *Id.* at 1266, citing *Edwards,* 851 F.2d at 136 ("when there is a conflict between plan documents and the summary plan descriptions disclosed to employees, the terms of the summary plan control") (emphasis added).[17]

In the case *sub judice,* there is something inherently inconsistent in PALIC's argument that an employee, aware only of the terms of the summary plan description, should be required to demonstrate that he affirmatively relied upon the summary terms which were inconsistent with a plan, the terms of which he was never made aware. Such a result would effectively render impotent congressional directives in ERISA calling for a summary written in

---

**16.** The court is aware of the case of *Howard v. Gleason,* 901 F.2d 1154, 1160–61 (2nd Cir.1990), which suggests that *McKnight, supra,* stands for the proposition that the Eleventh Circuit would require a plaintiff to prove some demonstrable reliance before granting recovery based upon the terms of a summary plan description. *See also Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310, 1319, n. 8 (3rd Cir.1991) (court cites *McKnight* for same principle). A close reading of *McKnight,* however, reveals no such ruling by the Eleventh Circuit. While the danger of reliance was identified as a reason for upholding the terms of a summary plan description, reliance was neither a disputed issue in the case nor specifically set out as a requirement. *See McKnight,* 758 F.2d at 1570. This court also notes that the *Howard* court also read a reliance requirement into the *Govoni* opinion, *supra.*

While the *Govoni* court pointed to reliance as a possible means for a plaintiff to enforce the provisions of a summary, the court alternatively contemplated recovery in situations where prejudice flowed from the faulty summary. *Govoni,* 732 F.2d at 252.

**17.** The court can envision circumstances where beneficiaries might suffer unfair denial of benefits without reliance on the terms of a summary. For example, a plan might provide certain benefits which an employer/insurer fails to cover in its summary. Employees would be unaware of the availability of those benefits and would effectively be denied those benefits despite a lack of awareness of or reliance upon anything set forth in the summary.

layman's terms fully informing plan participants of all their rights and obligations. Employees would be faced with burdensome requirements of showing how their conduct conformed to the terms of the summary plan as opposed to the terms of the plan with which employees are unfamiliar. In effect, employees would be required to compare the summary with the oppressive, complex plan documents which Congress realized many employees would be unable to interpret.

The court finds that the terms of the SPD created an open ended election period subject only to COBRA's maximum length of time a plan must provide continuation coverage to employees: eighteen months from the date of the qualifying event. *National Companies*, 929 F.2d at 1567–68. Branch, properly empowered as temporary administrator, executed the form on behalf of Mr. Bell opting to activate continuation coverage within the open-ended election period.[18]

■ Even if the court were to read a reliance requirement in to ERISA law in this area, the record would, nonetheless, favor recovery on behalf of Mr. Bell. Despite the absence of a surviving plan beneficiary, like the plaintiff in *McKnight*, to affirmatively argue that he specifically relied upon the terms of the SPD, the court finds sufficient evidence in the record to satisfy such a reliance test. Mr. Bell's conduct, when presented with information concerning continuation coverage—demonstrably unconcerned about seeking instruction as to how to properly complete the election form—is consistent with an understanding that he was under no short term time constraints. Mr. Bell was an angry employee seeking to sever his employment relationship as quickly as possible. Nothing in the record indicates that any information provided him by G. Bernd as administrator put him on notice of the exigency of making an informed, timely election. Allowing employees to rely upon the benefits which an employer/insurer leads them to believe are provided them is the policy which led Congress to pass ERISA. Given this policy, and considering Mr. Bell's conduct in combination with the lackadaisical approach taken by G. Bernd and PALIC in attempting to comply with strict ERISA directives, the court detects a flavor of reliance present in all the transactions which led to this dispute.

Under the facts before the court, PALIC's SPD failed to set out a specific election period. Failure to set out such a period created an open-ended election period subject only to COBRA's prescribed maximum period during which a plan must provide continuation coverage. *See National Companies*, 929 F.2d at 1567–68 (eighteen months from the qualifying event). PALIC's poor drafting of the SPD precludes defendants from asserting that Branch's execution of the election form occurred outside the prescribed election period. This result is consistent with congressional intent that plan summaries accurately reflect available benefits under a plan.

### 2) Tolling the Election Period.

■ Even if the court were to find that the election period was limited to sixty (60) days under the Plan, Branch enjoys a separate basis for recovery. An election period of any duration is tolled during periods of incapacity which render a beneficiary incapable of making an election.

COBRA and the relevant regulations do not specifically address the issue of whether the period for election can be tolled due to incapacity and/or death of the covered employee. Defendants argue that the absence of a COBRA provision setting forth conditions for which the election period might be tolled evidences Congressional intent that no such tolling is possible. Defendants would have the court read the following regulation quite literally, leaving no room for exceptions:

> period which, when elapsed, forecloses the option of activating benefits. The prejudice directly attributable to such a drafting error is obvious; after sixty (60) days no benefits are available.

---

**18.** This court, under the analysis in *Govoni,* also perceives "possible prejudice flowing from the faulty plan description" in the case *sub judice. See* n. 16, *supra.* The plan description fails to inform plan beneficiaries of a sixty (60) day

A qualified beneficiary who fails to elect COBRA continuation coverage in connection with a qualifying event ceases to be a qualified beneficiary at the end of the election period.

52 Fed.Reg. 144 at 22,724, Q & A–17. Defendants argue that even if Branch as temporary administrator was authorized to execute the election form, such an election would have been timely only if made by May 15, 1989, sixty (60) days from the date when Mr. Bell was notified as to his option to elect continuation coverage under COBRA.

Branch, while acknowledging the absence of clear direction from COBRA itself, argues that the proposed regulations themselves contemplate a tolling of the election period in situations involving death or incapacity. Branch relies heavily upon the only language in the regulations dealing with the power of an administrator to elect. *See* 52 Fed.Reg. at 22,730, Q & A–37 ("An election on behalf of a qualified beneficiary who is incapacitated or dies can be made by the legal representative of the qualified beneficiary or the qualified beneficiary's estate, *as determined by state law* ...") (emphasis added). Branch reads the regulation as a directive that all issues surrounding the powers and actions of an administrator be determined under the relevant state law. Branch concludes that under the circumstances, Georgia common-law doctrines would and should toll the election period first, during the period of Mr. Bell's incapacity and second, from the date of Mr. Bell's death until the date Mr. Branch was appointed as temporary administrator.

The court cannot extract from this proposed regulation specific direction either with regard to the Treasury Department's contemplation of situations calling for the election period to be tolled or with regard to the proper source of law—either state or federal—to determine whether the election period should, indeed, be tolled under the circumstances. The court does not read

the proposed regulation as the product of any serious contemplation of the circumstances under which the election period should be tolled. The proposed regulation, while dispensing with PALIC's meritless argument that an administrator may not elect on behalf of a deceased qualified beneficiary, merely directs that the *appointment* of such legal representative or administrator is a matter to be determined under applicable state law. The proposed regulation goes no further.

Equally inventive, BCBS—in words similar to BCBS's arguments favoring a rigid sixty (60) day election period—reads into COBRA an inflexible policy against tolling the limitations period which the court is unable to find. *See* Trial Brief of BCBS, p. 7 (quoting *Somers, supra,* at 152) ("A failure to make an election within the confines of the sixty (60) day period is an absolute bar to any COBRA entitlement"). The court finds these arguments novel, but unsupported by COBRA itself.

Of even greater interest to the court is the statute's contemplation of circumstances which may by operation of law extend the otherwise applicable election period following the qualifying event, even if the employer has specifically defined the election period to be *no more than* sixty (60) days. In cases where the qualifying event predates the date upon which the qualified beneficiary received notice of his COBRA rights, the election period extends beyond the sixty (60) day minimum period for an additional period equal in time to the days after the qualifying event, but before the notice requirement is satisfied. *See* 29 U.S.C. § 1165(1)(C); House Report at 622 ("[election period] ends *not earlier* than 60 days after the date the individual is notified of his continuation coverage rights ...") (emphasis added).[19]

In effect, the election period is tolled. This tolling of the election period is consistent with policies and concerns which initially led to the passage of COBRA, *supra,* and ERISA: that employees are unable to

---

**19.** As stated earlier, the court declines to determine whether G. Bernd's arguable failure to inform Mr. Bell of his COBRA rights in writing prevented commencement of the election period.

make valid decisions concerning benefits unless they are fully and truthfully informed with regard to these rights. Nowhere do COBRA, the proposed regulations, or the House Report state that the election period is not subject to tolling. Such an unbending statutory election period would be inconsistent with the concerns leading to the passage of COBRA. COBRA simply prescribes an absolute minimum period subject to reasonable extensions until an employee is capable of making an informed decision concerning continuation coverage.

■■■■ Branch argues that tolling the election period in the case *sub judice* would foster the policies which led Congress to pass COBRA. Due to incapacity, Mr. Bell was incapable of an informed, conscious execution of the election form. Tolling the election period until the appointment of Branch as temporary administrator would, in essence, effectuate an election made by on the eleventh day during which a person was properly empowered and capable of making an election on behalf of Mr. Bell.[20]

The court finds defendants' arguments opposing the tolling of the sixty (60) day election period no more compelling than those criticizing COBRA's "negative selection" period which allows beneficiaries to take a "wait and see" approach to the decision of whether to elect coverage. BCBS argues that tolling the election period due to incapacity will render insurers unable to "calculate their risks or evaluate appropriate premiums." *See* Trial Brief of Defendant Blue Cross Blue Shield: Tab 53, p. 10. The court is unconvinced. Branch seeks to toll only the *election* period; the maximum *coverage* period is eighteen months and is, with one rare exception, never subject to expansion. *See* 52 Fed. Reg. 114 at 22,730 (Q & A 39, 40) (with one exception, maximum period of coverage is eighteen months; "[n]o qualifying event can give rise to a maximum coverage peri-

od that ends more than 36 months after the first qualifying event").[21] Furthermore, while incapacity may in rare instances extend the election period, insurance companies' difficulties in calculating risks do not strike the court as a valid basis for disallowing a tolling of the election period: tolling which arguably effectuates Congress' expressed concern with growing numbers of uninsured Americans. *See* H.R. Report 99–241, 99th Cong., 2nd Sess., *Reprinted in* 1986 U.S.Code Cong. and Admin.News, 622–623 (vol. 3).

The court, therefore, finds that even if the election period under the Plan was set at sixty (60) days, Branch's execution of the election form was timely in that the election period was tolled from March 25, 1989, (the date Mr. Bell was shot and thereby incapacitated) until May 25, 1989, (the date Branch was appointed as temporary administrator for Mr. Bell's estate).

### D. Liability

■■■■ Briefly, the court finds that BCBS is liable for no part of the cost of Mr. Bell's hospital care. It is undisputed that Mr. Bell was shot on March 25, 1989, while PALIC remained on the risk. All subsequent care provided to Mr. Bell treated conditions directly traceable to his gunshot wounds. BCBS came on the risk as of March 27, 1989. The court need not address BCBS's arguments with regard to whether G. Bernd concealed the possibility of liability for Mr. Bell's hospitalization; such arguments have no bearing upon the issue of BCBS's liability. The clear language of the insurance contracts provided by PALIC and BCBS respectively forecloses the possibility of holding BCBS liable for any of Mr. Bell's medical bills.

PALIC's contract (heretofore "the Plan") contemplates situations which will effect a cessation of coverage, including the date the policy ceases (here March 26, 1989).

---

**20.** Mr. Bell was shot and incapacitated ten (10) days into the election period; Branch executed the form on the very day of his appointment as temporary administrator.

**21.** The only circumstances which might lead to a maximum period of coverage of 36 months arise when a qualifying event that gives rise to an 18 month maximum coverage period is followed, within that 18 months, by a second qualifying event. *Id.*

*See* Plaintiff's Exhibit 8 at p. GER 1986–MP–28. Situations such as total disability, however, may bring about an extension of benefits. PALIC's Plan states:

> If you are totally disabled when your insurance ceases, benefits will be extended:
>
> B. Under Major Medical (If applicable)
>
>   1. for the three months following the cessation of insurance ...

*Id.* Consistent with this provision, BCBS's insurance contract specifically exempts payment of benefits to employees who were away from work due to a disability, at the time BCBS came on the risk, due to conditions covered under an extension of benefits by the prior carrier (PALIC). *See* Plaintiff's Exhibit 10, P. 10, § 1.7.[22] Accordingly, let judgment be entered in favor of Blue Cross Blue Shield.

■ The court must determine upon whom, between G. Bernd and PALIC, liability for Mr. Bell's medical costs must fall. Were the court to have specifically found that tolling of the election period was the sole available basis for justifying the payment of benefits under PALIC's Plan, liability would fall squarely upon the shoulders of PALIC—the insurer. However, PALIC argues that the court's finding that the SPD created an open-ended election period specifically limited to sixty (60) days by the contract between PALIC and G. Bernd effectively shifts liability to G. Bernd as "administrator" of the Plan.

G. Bernd acted as administrator of the Plan and, as such, assumed obligations which exposed G. Bernd to statutory liability under ERISA, *see, e.g., Somers, supra,* at 151 (administrator may be held personally liable to beneficiary for amounts up to $100 a day for failure to meet COBRA notice requirements). ERISA places upon the administrator of a plan the duty to prepare an accurate summary plan description and distribute the summary to plan participants and beneficiaries. Logically,

any liability stemming from misinformation in the summary falls upon the administrator.

PALIC, nonetheless, is liable for Mr. Bell's medical bills. For, under the court's analysis of the effect of incapacity upon the running of *any* election period, Branch's execution of the election form on May 25, 1989, activated Mr. Bell's medical coverage *under the PALIC Plan.* The tolling of the election period due to Mr. Bell's incapacity would extend coverage under PALIC's Plan regardless of the accuracy of the SPD. Mr. Bell's estate enjoys a right to recover under the insurance contract (the Plan). PALIC, as insurer, is liable under the terms of that contract.

Accordingly, let judgment be entered favor of plaintiff Branch and against defendant PALIC in the amount of $97,192.00.[23]

SO ORDERED.

---

22. The court notes that PALIC's Plan contains a similar provision with regard to employees who were disabled when PALIC assumed coverage. *See* Plaintiff's Exhibit 8, p. GER 1986–MP–32.

23. The court accepts PALIC's argument that the amount of Mr. Bell's medical bills is subject to a $500.00 deductible and a $1000.00 out-of-pocket cap. *See* Plaintiff's Exhibit 8, pp. GER MP–7, GER MP–8.