**H. Lynn BRANCH, Administrator of the Estate of Dwayne Elijah BELL, Plaintiff-Appellee,**

v.

**G. BERND COMPANY, Defendant,**

**Pan American Life Insurance Company, Defendant–Appellant,**

**Blue Cross & Blue Shield of Ga., Inc., Defendant.**

No. 91–8545.

United States Court of Appeals, Eleventh Circuit.

March 25, 1992.

---

Craig N. Cowart, Macon, Ga., for Pan American Life Ins. Co.

John A. Draughton, Sell and Melton, Macon, Ga., for H. Lynn Branch.

Michael R. Hurst, Heyman and Sizemore, William H. Major, Atlanta, Ga., for Blue Cross and Blue Shield of Ga.

Before COX, Circuit Judge, JOHNSON * and REAVLEY **, Senior Circuit Judges.

REAVLEY, Senior Circuit Judge:

H. Lynn Branch, administrator of the estate of Dwayne Elijah Bell, brought this suit to recover health insurance benefits under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461, and the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C. §§ 1161–1168. Pan American Life Insurance Co. (PALIC) appeals from the district court's judgment holding PALIC liable for the costs of treating the injuries that led to Bell's death. *See Branch v. G. Bernd Co.*, 764 F.Supp. 1527 (M.D.Ga. 1991). As alternative grounds for its decision, the district court held that: (1) an administrator of an employee health plan who provides a beneficiary with an inaccurate summary of that plan may not enforce the plan's terms that are inconsistent with those of the summary regardless of whether the beneficiary proves reliance on the summary, and (2) the period during which COBRA allows a beneficiary to elect to continue coverage under a health plan is tolled by the beneficiary's incapacitation during that election period. *Id.* at 1540. We affirm, based on the court's second ground.

## I. BACKGROUND

As an employee of the G. Bernd Co. (G. Bernd), Bell received insurance coverage under G. Bernd's Employee Welfare Benefit Plan (the Plan). PALIC issued an insurance policy that provided health and hospitalization coverage under the Plan during the time period relevant to this case.[1] As required by COBRA, the Plan offered G. Bernd's employees the option of continuing their health coverage at their own expense for eighteen months after termination of their employment.

On March 15, 1989, Bell telephoned G. Bernd's administrative assistant, Jane Pratt, to announce that he was resigning because of G. Bernd's new drug testing policy, and to arrange to get his last pay check. During this conversation, Pratt advised Bell of his COBRA right to elect continued health insurance coverage. Later that day, Bell went to Pratt's office, and she again informed him of his COBRA right and offered him an election form. Bell refused to complete the form and left the office after Pratt told him that his check would not be available until the following day. Pratt was not in the office when Bell returned the next day, so an unidentified G. Bernd employee gave Bell his pay check, which was attached to a COBRA election form. Bell signed the form, but instead of electing to accept or decline continued coverage for himself, he checked a box declining continued coverage for his dependents. Bell had no dependents. The employee apparently misfiled this form in Bell's personnel file, and it was not discovered until May 25, 1989.

On March 25, 1989, Bell was admitted to the Medical Center of Central Georgia (the Hospital) in a semi-comatose condition after an unknown gunman shot him several times. On March 30, a Hospital employee contacted Pratt to inquire about Bell's medical coverage. Pratt, who was unaware of the form that Bell had signed on March 16, told the Hospital employee that Bell had quit his job but was still eligible to elect continued coverage under COBRA. Pratt sent a new election form to the Hospital that day. Bell was never able to complete the new form before he died on April 9, 1989, leaving the Hospital with unpaid medical bills totalling approximately $98,000.

---

\* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

\*\* Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. PALIC's policy was effective until midnight, March 26, 1989. On May 12, 1989, Blue Cross & Blue Shield of Georgia (BCBS), a defendant in this case, issued a policy with retroactive coverage beginning March 27, 1989. The district court determined that all of the medical expenses for which Branch seeks coverage are traceable to the injuries that Bell received on March 25, 1989, when only PALIC's policy was in effect, and thus BCBS is not liable in this case. *Branch,* 764 F.Supp. at 1542. We find no error in this determination.

On May 25, 1989, a probate judge appointed Branch, a Patient Accounts Manager at the Hospital, temporary administrator of Bell's estate. Branch immediately elected to continue Bell's health coverage, and delivered the form to G. Bernd with a payment for premiums due. Later that day, Pratt called the Hospital's attorney, Mary Katz, and informed Katz that she had found the form that Bell signed on March 16. Pratt stated that she believed that Bell had effectively declined continued coverage, and thus she would not accept Branch's election form.

Branch brought this suit against G. Bernd, PALIC, and BCBS on July 13, 1989, seeking an extension of Bell's health coverage under COBRA and ERISA. After a bench trial on October 10, 1990, the district court found that Branch's election on May 25, 1989 was effective to continue Bell's health coverage, and thus PALIC is liable for the $98,000 medical bill.

## II. DISCUSSION

### A. CONTINUED COVERAGE UNDER COBRA

■ COBRA requires the sponsor of a group health plan to provide the plan's beneficiaries with the opportunity to elect continued coverage under the plan if they lose coverage as a result of a "qualifying event." 29 U.S.C. § 1161. Bell's resignation was a qualifying event under COBRA. *Id.* § 1163(2). By making a proper election and paying the necessary premiums, a beneficiary may extend coverage for at least eighteen months after the qualifying event. *Id.* § 1162(2). But the beneficiary must make the election to continue coverage within the "election period" that the plan provides. COBRA defines an election period as the period that—

(A) begins not later than the date on which coverage terminates under the plan by reason of a qualifying event,

(B) is of at least 60 days' duration, and

(C) ends not earlier than 60 days after the later of—

(i) the date described in subparagraph (A), or

(ii) [the date the employee is notified of the rights to continued coverage].

*Id.* § 1165(1). Thus, the plan must allow the beneficiary *at least* 60 days from the later of the date that the beneficiary receives notice of COBRA rights or the date of the qualifying event in which to elect continued coverage. The plan *may* provide for an election period *greater* than 60 days. *See Branch,* 764 F.Supp. at 1535–37 and authorities cited therein.

■ The district court made several findings that the parties do not now dispute and with which we agree. First, Bell received notice of his COBRA rights on March 16, 1989, the day after his' qualifying event, so Bell's election period began on that date. *Id.* at 1534. Second, the election form that Bell "negligently executed" on that date did not represent an "informed election under COBRA" and thus is "useless to the court's analysis." *Id.* at 1533–34. Third, Branch, as the court-appointed administrator of Bell's estate, was empowered to make an election on Bell's behalf. *Id.* at 1535. Finally, because Bell never effectively declined extended coverage, Branch's election on May 25, 1989—if timely—would extend coverage retroactively from March 16, 1989, the date of the qualifying event. *Id.* at 1535 n. 12.

PALIC contends, however, that the district court erred in holding that Branch's election on May 25, 1989—seventy days after the election period began—was made within the controlling election period. To resolve this issue, we must determine the length of Bell's election period and the date on which that period ended.

### B. HOW LONG WAS BELL'S ELECTION PERIOD?

G. Bernd's Plan expressly set forth a 60-day election period, consistent with the minimum required by COBRA. But G. Bernd did not provide a copy of the Plan to Bell or to the Hospital, nor did it otherwise inform them of the Plan's 60-day limit. Instead, G. Bernd provided Bell with a printed summary of the Plan as required by ERISA, 29 U.S.C. § 1022. But this

summary stated that the election period was only 31 days, and thus it was inconsistent with the 60–day election period that the Plan provided and violated COBRA's 60–day minimum. The district court held that, because the summary set forth an election period that violated COBRA's 60–day minimum, and because Bell was not provided with a copy of the Plan, G. Bernd and PALIC could not rely on the summary *or* the Plan to limit Bell's election period. Thus, the court held that "the terms of the [summary] created an open ended election period subject only to COBRA's maximum length of time a plan must provide continuation coverage to employees: eighteen months from the date of the qualifying event." *Branch,* 764 F.Supp. at 1540 (citation omitted).

To reach this conclusion, the district court first rejected PALIC's contention that, to prevent G. Bernd and PALIC from invoking the Plan's 60–day limit, Branch must show that Bell or the Hospital detrimentally relied on the summary. The court then stated that, even if Branch must show reliance, the facts of this case indicate "a *flavor of reliance* present in all the transactions which led to this dispute." *Id.* (emphasis added). We disagree with the district court on both points.

### 1. The Reliance Requirement

The district court essentially applied a form of strict liability against an employer who provides an inaccurate plan summary to its employees, holding that "case law in this area specifically suggests that, unlike a party invoking the doctrine of equitable estoppel, a plaintiff who seeks to enforce the terms of a summary plan description need not prove detrimental reliance in order to recover." *Id.* at 1539. We do not read the case law to make this suggestion.

The First and Third Circuits have expressly held that a beneficiary who seeks to prevent an insurer from enforcing terms in its plan that are inconsistent with those of the plan summary must show reliance on the summary. *Bachelder v. Communications Satellite Corp.,* 837 F.2d 519, 522–23 (1st Cir.1988) ("Appellees cannot recover

... because appellees did not show significant reliance or even the possibility of prejudice flowing from the [summary]."); *Govoni v. Bricklayers, Masons and Plasterers Int'l Union Local No. 5 Pension Fund,* 732 F.2d 250, 252 (1st Cir.1984) ("[c]ase law suggests ... that to secure relief, Govoni must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description"); *Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310, 1319 n. 8 (3rd Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991) (following *Bachelder*).

Although this court has not expressly held that beneficiaries must prove reliance on misleading summaries, it has emphasized the importance of reliance in its analysis of these disputes. In *McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566 (11th Cir.1985), this court rejected the argument that the terms of an insurance plan should prevail over inconsistent terms in a plan summary because "[i]t is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for *reasonably relying* on the summary booklet." *Id.* at 1570 (emphasis added). The *McKnight* panel based its decision on the fact that "McKnight was *justified in relying* on the summary booklet to determine his pension rights." *Id.* at 1571 (emphasis added). Like this court, the Second Circuit has looked to an employee's reliance on a plan summary as its basis for holding that the terms of the summary prevail over inconsistent terms in the plan, without expressly holding that reliance must be shown. *Heidgerd v. Olin Corp.,* 906 F.2d 903, 907–08 (2d Cir.1990) (ERISA "contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are *entitled to rely* on the descriptions contained in the summary) (emphasis added).

■ Only the Sixth Circuit has stated that a beneficiary need not show reliance to

enforce a summary's terms over those of the plan. *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134 (6th Cir.1988). The district court in the present case relied on the statement in *Edwards* that:

> existing precedent does not dictate that a claimant who has been misled by summary descriptions must prove detrimental reliance. Congress has promulgated clear directives prohibiting misleading summary descriptions. This court elects not to undermine the legislative command by imposing technical requirements upon the employee.

*Id.* at 137 (*quoted in Branch*, 764 F.Supp. at 1539). But we refuse to accept this statement of the law, and to reject a reliance requirement, for several reasons. First, the statement is dictum because the *Edwards* court found that the beneficiary in that case reasonably relied on the summary plan description. *Id.* Second, the *Edwards* court, in making this statement, recognized that the beneficiary must have "been misled" by the summary, and thus a more reasonable interpretation of the *Edwards* court's statement is that the beneficiary who *relies* on the summary need not prove *detriment*. Third, the *Edwards* court cited none of the "existing precedent" to which it referred, and none appears to exist. Finally, we do not share the Sixth Circuit's belief that we would undermine Congress' objectives by requiring beneficiaries to prove reliance on inaccurate plan summaries. Congress, at 29 U.S.C. § 1022, required employers to provide their employees with accurate and understandable summary plan descriptions because it wanted "to protect the beneficiaries of benefit plans by insuring that employees are fully and accurately apprised of their rights under the plan." *In re HECI Exploration Co.*, 862 F.2d 513, 524 (5th Cir.1988); *see also* 29 C.F.R. § 2520.102–2 (1991). Of course, when an employer provides an inaccurate plan summary, the beneficiaries who rely on that summary are not accurately apprised of their rights. But when a beneficiary fails to read or rely on the summary, whether it is accurate or not, the beneficiary also prevents full apprisal of the rights under the plan. Beneficiaries must do their part if Congress' objective is to be met. We thus hold that, to prevent an employer from enforcing the terms of a plan that are inconsistent with those of the plan summary, a beneficiary must prove reliance on the summary.[2]

### 2. Reliance in this Case

■ The district court stated that, if reliance is required, "considering Mr. Bell's conduct in combination with the lackadaisical approach taken by G. Bernd and PALIC in attempting to comply with strict ERISA directives, the court detects a flavor of reliance present in all the transactions which led to this dispute." *Branch*, 764 F.Supp. at 1540. It is unclear from the court's statement exactly what it found reliance upon. We reiterate our holding that a beneficiary must show reliance *on the terms of the summary. Bachelder*, 837 F.2d at 523; *McKnight*, 758 F.2d at 1570. To the extent that the district court found reliance on the summary in this case, we hold that the court's finding is clearly erroneous. There is no evidence in the record that Bell ever read or relied on the summary. Rather, Bell's conduct revealed absolute apathy regarding time limits or even continued health coverage. And

---

**2.** Branch contends that this case differs from those in which courts required reliance because the summaries in those cases *misrepresented* the plans' terms while G. Bernd's summary *omitted* the plan's 60–day election period. Branch bases this argument on the district court's finding that, despite the fact that G. Bernd's summary expressly allowed the employee 31 days in which to elect continued coverage, it actually "set[ ] out *no* specific election period." *See Branch*, 764 F.Supp. at 1531 (emphasis added). We assume that the district court believed that a 31–day period, which is not "at least 60 days" as required by section 1165(1)(B), is not an "election period" under COBRA. Branch contends that we should not require reliance on a summary that *omits* or *fails to provide* information because such an omission can never inspire reliance and denies the beneficiary of information necessary to make a decision. But a beneficiary who receives a summary that omits the plan's limit on the election period could prove reliance with evidence that the beneficiary received and read the summary and failed to make a timely election based on the belief that there was no time limit. It is thus irrelevant in this case whether the summary *misrepresented* or *omitted* the election period.

there is no evidence that Branch or the Hospital ever had a copy of the summary on which to rely. In fact, all of the evidence indicates that the Hospital always assumed that the election period was 60 days. Because Branch has offered no evidence of reliance on G. Bernd's summary, we hold that the Plan's 60-day election period is effective in this case.

## C. When Did the Election Period End?

The district court determined that, even if the Plan's 60-day election period controls, Branch's election on May 25, 1989 was timely because the election period was tolled from Bell's incapacitation on March 25, 1989 until the probate court appointed Branch as administrator on May 25, 1989. *Branch*, 764 F.Supp. at 1540. The court acknowledged that COBRA and its underlying regulations do not address tolling, but found that "tolling of the election period is consistent with policies and concerns which initially led to the passage of COBRA ... and ERISA...." *Id.* at 1541–42. PALIC contends that the district court erred in applying tolling principles to this case.

■ While ERISA and COBRA preempt state law, Congress has authorized federal courts to create federal common law to implement these statutory schemes. *Kane v. Aetna Life Insurance*, 893 F.2d 1283, 1285 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990). Whether courts should read equitable tolling principles into COBRA's election period as a matter of federal common law is an issue of first impression in the federal courts of appeals.[3] But we find guidance for our decision in the line of cases addressing the application of equitable tolling principles to federal statutes of limitation. The Supreme Court has recognized the power of federal courts to read equitable tolling principles "into every federal statute of limitation," *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946), unless it would be "inconsistent with the legislative purpose" to do so. *American Pipe and Constr. Co. v. Utah,* 414 U.S. 538, 559, 94 S.Ct. 756, 769, 38 L.Ed.2d 713 (1974); *accord Hill v. Texaco, Inc.,* 825 F.2d 333, 334 (11th Cir.1987). Thus, "the basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." *Burnett v. New York Central C.R. Co.,* 380 U.S. 424, 427, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965). We determine Congress' purpose by examining "the purposes and policies underlying the limitations provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act." *Id.*

Congress' broad purpose in enacting COBRA was to "provide continued access to affordable private health insurance," which it believed was necessary because of "the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay." H.R.Rep. No. 241, Part 1, 99th Cong., 2d Sess. 44, *reprinted in* 1986 U.S.C.C.A.N. 579, 622. To this end, Con-

---

**3.** The only decision other than that of the district court in this case that we have found even related to this issue is *Sirkin v. Phillips Colleges, Inc.,* 779 F.Supp. 751 (D.N.J.1991). In *Sirkin,* the district court of New Jersey held that, "where an insured misses a premium deadline under COBRA due to the insured's incapacity to know of or meet her obligation, the deadline for that premium payment is tolled for a reasonable period of time until the insured or her legally appointed guardian is able to cure the deficiency." *Id.* at 758. Sirkin timely elected to continue health coverage under her employer's plan after leaving her job, and sent a check toward payment of the premium. Prior to the date on which the next payment was due, Sirkin was hospitalized and became mentally incapacitated. After Sirkin's second premium payment was more than 30 days late, Phillips Colleges terminated Sirkin's coverage as provided by 29 U.S.C. § 1162(2)(C).

Relying on the decision of the district court in the present case, the *Sirkin* court held that Sirkin's incapacity tolled the period for payment of the premium until the appointment of a legal guardian. The court considered it "inconceivable ... that a statutory scheme which is otherwise so generous and protective of employees enrolled in employment benefit plans would in this instance ignore both equity and reason by requiring employees suddenly incapacitated and physically unable to secure their benefits to forfeit so basic a need as health coverage." *Id.* at 756.

gress provided that beneficiaries who would otherwise lose health coverage as a result of a qualifying event must be given the opportunity to continue that coverage for a specified period. 29 U.S.C. § 1161. Moreover, Congress specifically provided that the employer's health plan must allow its beneficiaries *at least 60 days* after notice of their right to continued coverage in which to make an informed decision. *Id.* § 1165(1).[4] And once the beneficiary elects to continue coverage, "[t]he coverage must extend for at least the period. *beginning on the date of the qualifying event." Id.* § 1162(2) (emphasis added).

■ Thus, the beneficiary's coverage relates back to the date of the qualifying event, regardless of when during the election period the election is made. *See also* 52 Fed.Reg. 22,716, 22,729, Q & A–34.[5] We agree with the district court's determination that coverage continues from the date of the qualifying event even if the beneficiary makes an election *after* incurring medical expenses during the election period. Congress assured beneficiaries at least 60 days in which to elect to continue coverage *from the date of the qualifying event* because this furthers its goal of reducing the number of uninsured Americans. Nowhere does COBRA provide that an intervening need for medical care will prevent the extension of coverage from relating back to the time of the qualifying event.

Thus, a beneficiary like Bell who loses coverage because of a qualifying event may adopt a wait-and-see approach to continued coverage, and then elect coverage *if and when* medical care is required during the election period. But a problem arises when, as here, the need for care results in incapacitation, rendering the beneficiary unable to make an election and thereby depriving the beneficiary of what remains of the election period. By applying tolling principles in such a case, we solve this problem in a manner that effectuates Congress' intent.

■ COBRA is silent on the question of whether the administrator of the estate of a beneficiary who dies during the election period may make an election on the beneficiary's behalf. The Treasury Department has addressed this question and proposed regulations that allow the beneficiary's legal representative to make the election for the beneficiary. *Id.* at 22,730, Q & A–37.[6] We find that these regulations represent the proper construction of COBRA in light of Congress' intent. In the easy case, the beneficiary dies or is incapacitated *and* the representative is appointed within the election period. But when the representative is not appointed until after the election period expires, the resulting time gap deprives the beneficiary of the opportunity to have at least 60 days during which to make an election. By tolling the election period from the time that the beneficiary is incapacitated until the representative is appointed, we effectuate the objectives of COBRA to: (1) allow the beneficiary (or his representative) at least 60 days in which to make an informed election; (2) allow the

---

**4.** As the district court noted, section 1165(1), which provides that the election period *begins* not later than the date of the qualifying event and *ends* not earlier than 60 days after the beneficiary receives notice of the right to elect continued coverage, creates a form of tolling that exhibits Congress' intent to allow beneficiaries *at least* 60 days in which to make an *informed* decision.

**5.** The Department of Treasury has proposed the only regulations that relate to COBRA procedures. Q & A–34 provide:

Question 34: During the election period and before the qualified beneficiary has made an election, must coverage be provided?

Answer 34: (a) In general, each qualified beneficiary has until at least 60 days after the

date that the qualifying event would cause him or her to lose coverage to decide whether to elect COBRA continuation coverage. If the election is made during that period, coverage must be provided from the date that coverage would otherwise have been lost....

**6.** The regulations state:

Question 37: Can each qualified beneficiary make an independent election under COBRA?

Answer 37: Yes.... An election on behalf of a qualified beneficiary who is incapacitated or dies can be made by the legal representative of the qualified beneficiary or the qualified beneficiary's estate, as determined under applicable state law, or by the spouse of the qualified beneficiary.

beneficiary to elect retroactive continued coverage after the need for medical care arises within that election period; and (3) minimize the number of uninsured Americans.

PALIC argues that, because Congress only required a *minimum* of 60 days, it chose to leave it to private parties to extend this time by contract if they so desire. PALIC contends that, by reading equitable tolling into section 1165, we are requiring the parties to agree to a longer election period than Congress has mandated. But this argument ignores the fact that a beneficiary who is incapacitated during the 60 day period does not receive a minimum of 60 days in which to make an informed decision. Only by tolling the period until the appointment of a representative can we ensure that beneficiaries receive the full 60–day election period that Congress has required.

PALIC also contends that, even if we apply tolling to COBRA's election period, we should do so only if the beneficiary was incapacitated at the time of the qualifying event, when the election period began, because a *subsequent* disability does not toll a limitations period. The rationale of this argument, as we understand it, is that a beneficiary who is initially able to make an election but is later incapacitated has had the chance and lost it. But the beneficiary's "chance" under COBRA is to elect continued coverage *after* the need for medical care arises during the election period. When this need results in incapacitation, the beneficiary is deprived of the "chance" that COBRA provides.

 By reading equitable tolling principles into COBRA, we effectuate Congress' purpose for that Act. We thus hold that Bell's 60–day election period was tolled from the date of his incapacitation until the date that Branch was empowered to make the election on Bell's behalf. Because Bell was incapacitated on the tenth day of his election period, and Branch elected to continue coverage on the day that he was appointed as administrator, Branch's election was timely and effective to continue Bell's coverage without interruption from Bell's qualifying event until the time of his injury. Thus, PALIC is liable for Bell's medical expenses.

## III. CONCLUSION

The district court's judgment is AFFIRMED.