**Monroe WILLIAMS, Plaintiff–Appellant,**

v.

**MIDWEST OPERATING ENGINEERS WELFARE FUND, and Larry W. Bushmaker, as Administration Manager of the Midwest Operating Engineers Welfare Fund, Defendants–Appellees.**

No. 96–3889.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1997.

Decided Sept. 30, 1997.

Nick Katich (argued), Lucas, Holcomb & Medrea, Merrillville, IN, for Plaintiff–Appellant.

Alan H. Auerbach, James M. Neuman, Pasquale A. Fioretto, Catherine Chapman (argued), Stephen J. Rosenblat, Baum, Sigman, Auerbach, Pierson & Neuman, Chicago, IL, for Defendant–Appellee.

Before BAUER, CUDAHY and DIANE P. WOOD, Circuit Judges.

CUDAHY, Circuit Judge.

Monroe Williams was shot five times in the legs by a Gary, Indiana police officer. His medical bills amounted to over $200,000, all of which his health insurance plan, the Midwest Operating Engineers Welfare Fund (Fund), refused to cover. The Fund interpreted Plan language and found that it does not cover Williams' claim; Williams interpreted Summary Plan language and believes that it does cover his claim.[1] We are called upon to decide whether Summary language or Plan language should govern the terms of Williams' coverage, and other related issues.

Williams was shot on September 26, 1992. Williams wanted to visit his girlfriend, Mechie Chisholm, but she refused to let him enter her sister's apartment where she was staying. After she refused to open the door, Williams became angry and began to kick and knock against the door. Officer Roger Paul Smith was dispatched to Chisholm's apartment in response to Chisholm's sister's call reporting an unwanted person with a possible weapon. Officer Smith spoke with Williams upon his arrival, and Williams told him that he lived in the building and that his wife was inside the apartment. Both Officer Smith and Williams entered the apartment. Chisholm told Smith that Williams was not her husband, did not live in the apartment and was not welcome there. Smith then informed Williams that he would have to leave, at which point Williams apparently became hostile and aggressive towards Chisholm. Smith placed himself between Chisholm and Williams and began to escort Williams from the apartment. Williams knocked Smith out of his way and grabbed Chisholm; she broke free, ran into a bedroom and shut the door. Williams, apparently repeating "I'm bad, I'm bad," approached Officer Smith and lunged in a way that Smith interpreted as a threat. Smith fired five times into Williams' legs, stopping him. Officer Smith called for an ambulance and performed a search of Williams, which produced no weapon.

I. The Fund's Decision

As with most ERISA-governed plans, the participants in the Fund's Plan received only a Plan Summary. The Plan Summary does not purport to convey every detail of the Plan, but does promise to be consistent with the Plan. The Summary which Williams received stated that the Fund would cover hospital "charges for room and board ... if required for hospitalization or treatment due to a non-occupational injury or illness .... [and] miscellaneous expenses during hospital confinement [including] ... hospital supplies and services, X-rays, charges for ambulance service, emergency room, anesthetist, radiologist, pathologist...." Summary at 12. Under "What Is Not Covered" the Summary lists

> an illness or injury that is covered under Workers' Compensation, or that is recoverable from a responsible third party; any treatment or services not prescribed by an eligible provider ...; an illness or injury resulting from war or any act of war; illness or injury for anyone who is serving in the Armed Forces of the United States or any other government

as well as other circumstances unrelated to Williams' claim. *Id.* at 20. The Summary does not define "injury." The Plan, on the

---

1. The insurance plan in this case is governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* (ERISA). ERISA requires that plan participants be provided with an accurate, comprehensive, easy to understand summary of any covered retirement or insurance plan. 29 U.S.C. § 1022(a)(1).

other hand, defines both "injury" and "accident," as follows:

> Injury means bodily harm resulting from an accident. Accident, as used in the foregoing, means an undesirable or unfortunate happening, unintentionally caused, resulting in harm.

Plan at II–33. Based on the definitions of "injury" and "accident" in the Plan and the facts surrounding Williams' injury, the Fund's Review Panel concluded that Williams' injuries were not covered because they did not result from an "accident," because they were not "unintentionally caused." The Fund's reasoning was that "the term 'accident' does not include circumstances where a person intentionally commits an unlawful action and the injury is a reasonably foreseeable consequence of that action." August 17, 1993 Review Panel Decision at 4; January 7, 1994 Review Panel Decision at 2–3.

## II.   The District Court Decision [2]

■ Williams filed suit seeking coverage, and both he and the Fund filed motions for summary judgment. The district court granted summary judgment in favor of the Fund, holding that the Fund's decision not to cover Williams' injuries was legitimate on three different grounds: (1) that since Williams had not relied on the Summary, its terms were not binding, (2) that the Fund's interpretation of the Plan itself was not arbitrary and capricious and (3) that to cover Williams' injuries would "reward him for committing illegal acts." When an ERISA governed plan gives the administrator or fiduciary of the plan discretionary authority to determine eligibility for benefits or to construe the terms of the plan, we may review the administrator's decisions only to ensure that they are not arbitrary and capricious. See *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Russo v. Health, Welfare & Pension Fund,* 984 F.2d 762, 764–65 (7th Cir.1993). In this case, the Fund gave its Board of Trustees, as plan administrator, discretionary authority to determine eligibility for benefits and to resolve questions of plan interpretation. However, an interpretation based on the Plan when the Summary should govern would involve an error of law, and we review matters of law *de novo.* See *Casey v. Uddeholm Corp.,* 32 F.3d 1094, 1096 (7th Cir.1994).

Williams argues that the discrepancy between the Summary and the Plan entitles him as a matter of law to claim the coverage described in the Summary in preference to the coverage described in the Plan. While the district court agreed that "the common understanding of injury does not require it to be accidental" and thus, that there was a discrepancy between the Summary and the Plan, the court believed that Williams' interpretation would "reward him for committing illegal acts," which would in turn void the insurance contract. Memo. Order at 15. And because the court also believed reliance on the Summary to be a necessary condition of enforcement of the Summary terms, the court found that Williams could not enforce the Summary.

The district court then decided that the Trustees "could reasonably conclude that Williams caused the shooting by intentionally resisting arrest and threatening a police officer." *Id.* at 12. The district court elaborated: "[p]eople can intentionally act to cause happenings which they do not desire," meaning that Williams did not need to intend to be shot, but merely to act in a threatening manner to the police officer for the incident to be something other than an "accident." *Id.* at 13–14. We reverse.

## III.   Plan vs.  Summary

■ A summary must be "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1). In particular, a summary must list "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." § 1022(b). Williams' first argument for en-

---

**2.** The parties in this case consented to the Magistrate Judge conducting all proceedings in the district court, including the entry of final judgment.

forcing the Summary language over the Plan language is that the Summary language is binding upon both the insured and the insurer. *See, e.g., Senkier v. Hartford Life & Accident Ins. Co.,* 948 F.2d 1050, 1051 (7th Cir.1991) ("in the event of a discrepancy between the coverage promised in the summary plan document and that actually provided in the policy, [the insured] is entitled to claim the former"); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 982 (5th Cir.1991) ("this Court holds that the summary plan description is binding, and that if there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern"); *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (6th Cir.1988) (holding that the summary governs over the plan when there is a discrepancy); *Price v. Provident Life & Accident Ins. Co.,* 2 F.3d 986, 988 n. 1 (9th Cir.1993) (same); *McKnight v. Southern Life & Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985) (same). This is especially the case where, as here, the summary contains a rather glaring omission.

Here, the Plan's definition of "injury," as interpreted by the Fund, incorporates an arguable basis for denial of coverage; namely, that the injury resulted from something other than an accident—an unintentionally caused unfortunate occurrence. This qualification is not found in the Summary, which does not define "injury" or "accident." Thus, Williams contends that the Summary should control and the Fund should be estopped from using Plan language to deny coverage.

We agree with the district court that the common meaning of injury does not include a requirement that the injury-causing event be unintentional.[3] Presumably, then, because as an undefined term in the Summary, "injury" is given its common meaning, Williams' injury is covered and the Fund must pay his medical bills. The Fund argues, however, that unless Williams *relied* on the Summary

language in question, Williams is still bound to the Plan language.

## IV. Reliance by Insured

■ The Fund argues that Summary language is binding only if Williams relied on that language. The Fund further argues that Williams must prove that he relied on the Summary language.[4] However, as in *Hansen,* 940 F.2d 971, there is simply no reliance issue present here. Williams' conduct could not bear any realistic relation to his interpretation of the Summary. It is not credible that Williams' allegedly aggressive stance with Officer Smith could ever have been affected by the type of health insurance coverage Williams believed he possessed. In *Hansen,* the insurance policy in question provided benefits upon the death of an insured. The dispute was over the amount of those benefits (described differently in the summary and the plan). See *id.* at 982. The Fifth Circuit held that reliance was not an issue in the case (since the insured did not die in order to fulfill the conditions in the summary), and that the summary language was binding over the plan language. *Id.* at 983.

However, reliance can occur, not at the time of the pre-injury conduct, but at the time the claim is made if the circumstances and nature of the claim evidence reliance on the summary language. In *Senkier,* we held that, when there is a contradiction between the summary and the plan, the insured is entitled "to rely on the summary plan document, and if he does the plan is estopped to deny coverage." 948 F.2d at 1051. In *Senkier,* however, we did not have to address the nature of the required reliance because we found that there was no discrepancy or contradiction between the summary and the plan. *Senkier* involved accidental death coverage, and we found no discrepancy between the summary and the plan in the use of the term "accidental."

---

**3.** Webster's defines "injury" as "1 a: an act that damages or hurts: WRONG b: violation of another's rights for which the law allows an action to recover damages 2: hurt, damage, or loss sustained." Merriam Webster's Collegiate Dictionary 602 (10th ed.1994).

**4.** Perhaps Williams could claim that he told a friend that he was unafraid of the police because he knew that if they shot him, his insurance would pay for his medical care.

The Sixth Circuit has a long line of cases which enforce summary language over plan language, *see Edwards*, 851 F.2d at 136 (collecting cases), and has explicitly held that reliance is not required. However, in *Edwards* reliance was not a disputed issue, since the participant had in fact relied on the summary language. The Sixth Circuit wanted to ensure that courts in future cases would not mistakenly believe that Edwards' reliance had been a necessary element of his winning argument:

> [a]lthough [Edwards] relied to his detriment upon the language of the Summary ... existing precedent does not dictate that a claimant who has been misled by summary descriptions must prove detrimental reliance. Congress has promulgated clear directives prohibiting misleading summary descriptions. This court elects not to undermine the legislative command by imposing technical requirements upon the employee.

*Id.* at 137. See also *Fuller v. CBT Corp.*, 905 F.2d 1055, 1060 (7th Cir.1990) ("In the event of a conflict between handbook and plan, the former may trump—clearly so, when it is the employee relying on the handbook, for it is hardly realistic to expect him to read further.") (citing *Edwards*, 851 F.2d at 136).

Of course, reliance on the terms of the summary may be a realistic consideration if the question involves administrative requirements like the time and procedure for filing claims. This is an entirely different matter from attempting to determine whether conduct resulting in injury was influenced by the terms of health insurance. *See, e.g., Branch v. G. Bernd Co.*, 955 F.2d 1574, 1579 (11th Cir.1992) (reliance required to enforce a more lenient time limitation for election of COBRA benefits in summary in preference to a stricter limitation in plan).[5]

We also note that "reliance" can occur at the time a participant selects a plan. Many employers offer a choice of insurance plans to their employees. An employee who chooses one plan from among a number of plans is generally relying on the contents of the summary. Employees are given only the summary from which to make their decision.

---

**5.** The Fund attempts to rely on several cases which are claimed to have established broad reliance requirements. In *Govoni v. Bricklayers, Masons & Plasterers Int'l Union of Am., Local No. 5*, 732 F.2d 250, 252 (1st Cir.1984), the First Circuit resolved a dispute over the treatment of a "break" in service under the retirement plan. The court stated that "[c]ase law suggests ... that to secure relief, Govoni must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description." *Id.* (citations omitted). The summary Govoni was provided did not reveal that breaks in service would be treated differently depending on when they occurred. *Id.* Because the court found that Govoni suffered his loss at the time he took the break, before the plan was amended to be more generous and before a misleading summary was distributed, Govoni could not show that he relied on or suffered prejudice from the faulty summary. *Id.* Prejudice did not ensue because Govoni's loss occurred before the change in plan terms. We do not think Govoni stands for the broad proposition that reliance on the summary is required before the summary will be enforced. The meaning of "prejudice" as an alternative to "reliance" is not clear.

In *Bachelder v. Communications Satellite Corp.*, 837 F.2d 519, 523 (1st Cir.1988), the First Circuit again held that the plaintiffs failed to show reliance or prejudice. The summary in *Bachelder* included an example to explain how a company stock cash-out option operated. The example indicated that the stock value would be frozen at its value on December 31st of the year the option was elected. Instead, the cash-out value under the plan was set on the day when the cash-out actually occurred. *Id.* at 522. Arguably, the court's insistence on reliance or prejudice in *Bachelder* is more significant than it was in *Govoni*. But the court relied heavily on its concern that the rule derived from the summary example could quickly impair the plan's ability to provide a cash-out option in a declining market. Thus, the rule of the summary could require the sale of shares belonging to those declining the cash-out to cover the payment to those who chose the cash-out. *Id.* This scenario would interfere with the participants' vested rights and expose the fiduciaries to allegations of breach of fiduciary duty.

The Fourth Circuit uses a similar reliance or prejudice standard. In *Aiken v. Policy Management Sys. Corp.*, 13 F.3d 138 (4th Cir.1993), Aiken sued seeking a lump-sum payment of his retirement benefits. The summary authorized payment upon retirement while the plan authorized payment only after the participant reached the age of 60. *Id.* at 140. The court emphasized that a disjunctive reliance or prejudice standard applied, and remanded the case for further inquiry into whether Aiken had relied or would suffer prejudice. *Id.* at 141–42.

These cases do not stand for the general proposition that reliance on the summary is required before the summary can be enforced.

The act of choosing one plan over another necessarily involves a decision that the terms of one summary are more to one's liking than the terms of another. Such reliance would presumably be sufficient to prevent contradictory plan language from reducing a participant's benefits at a later date. As the Fifth Circuit noted in *Hansen*, 940 F.2d at 981–82, when discussing whether the master policy should govern if a summary and the policy were in conflict: ERISA requires, in no uncertain terms, that the summary plan description be "accurate" and "sufficiently comprehensive to reasonably apprise" plan participants of their rights and obligations under the plan. [A rule that the plan governs in the event of a discrepancy] would eviscerate this requirement. Under [such a rule] the summary would not need to be accurate or comprehensive—if there were an ambiguity in the summary or an inaccuracy that put the summary in conflict with the policy, that ambiguity or inaccuracy would be cured by the policy itself. The result would be that before a participant in the plan could make any use of the summary, she would have to compare the summary to the policy to make sure that the summary was unambiguous, accurate, and not in conflict with the policy. Of course, if a participant has to read and understand the policy in order to make use of the summary, then the summary is of no use at all.

We agree.

## V. Illegal Contract

■ The district court apparently believed that Williams' allegedly illegal act (threatening the police officer) led to his shooting, and thus that coverage for the medical care he required would constitute a "reward" for engaging in an illegal act. Reasoning that a contract, to be enforceable, must not reward illegal activity, the district court decided that coverage could not apply. However, the illegality involved here was far less directly connected with any economic benefit than is typically the case in an "illegality" analysis. Williams' insurance contract did not engage Williams for the purpose of illegal activity, nor did it encourage him to commit illegal

acts. This situation is not like committing murder to collect the benefits of insurance on the victim's life. Nor was the policy here acquired with the forthcoming altercation in mind. The district court seems to have believed that if the enforcement of an otherwise valid contract would result in any benefit to a person who has committed an illegal act, then the contract cannot be enforced. But this is a far broader proposition than that embraced by the usual "illegality" rules. This broader proposition ignores, among other things, the public health consideration that, once the injury-causing event occurs, there is a social interest in restoring even a wrongdoer to health.

Further, numerous examples exist of insurance contracts which operate in some respect to the benefit of individuals who have broken the law. Standard car insurance rewards law breakers in every auto accident resulting from a traffic violation.[6] In *Zurich Gen. Accident & Liab. Ins. Co. v. Flickinger*, 33 F.2d 853 (4th Cir.1929), an accidental death policy which contained no exclusion denying benefits if death was caused by illegal activity was held to cover such a death:

[T]he policy contains no provision exempting the insurer from liability for injury sustained as the result of violation of law.... In the absence of such a provision, we think it is clear that the insurer is liable, notwithstanding the insured may have been injured as a result of violating the law, if it does not appear that the policy was obtained in contemplation of such violation and the danger consequent thereon.... To hold that death or injury from violation of law defeats recovery under a policy, in the absence of provision to that effect in the policy itself, would open up an avenue for evasion of liability which, so far as our investigation goes, no court has yet seen fit to open. If insurance companies desire to avoid liability on such ground, they should insert a clause in their policies to that effect.

*Id.* at 855–56 (citations omitted). Certainly it is hard to imagine that Williams contrived to get himself shot five times in the legs *be-*

---

**6.** Should we abandon the reckless driver on the    side of the road with his injuries?

*cause of* the insurance policy. The alleged illegality of Williams' conduct therefore does not bar enforcement of the Summary language.

The judgment is REVERSED and RE-MANDED for further proceedings not inconsistent with this opinion.